UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

| | |
|---|---|
| IN RE: | Case No. 07-20223-wsd |
| JAMES D. LICAVOLI, | Chapter 7 |
| Debtor. | Hon. Walter Shapero |
| _____/ | |
| OLD REPUBLIC NATIONAL<br>TITLE INSURANCE COMPANY, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 08-4065-wsd |
| JAMES D. LICAVOLI, | |
| Defendant. | |
| _____/ | |

## OPINION DETERMINING NONDISCHARGEABILITY OF DEBT

### Introduction

This adversary proceeding was commenced by Old Republic National Title Insurance Company ("Plaintiff") to obtain a declaration that the debt owed to it by James Licavoli ("Defendant" or "Debtor") in the amount of $166,995.12 is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6). Following a trial, the Court instructed the parties to submit their proposed findings of fact and conclusions of law. For the reasons set forth below, the Court finds the debt nondischargeable under 11 U.S.C. § 523(a)(4).

### Background and Facts

Defendant was the president of Bay County Abstract, Inc. ("Bay"), a company in the business of selling title insurance policies. He purchased the company in July of 2002, and on March 13, 2003, he and Bay, "separately and collectively," entered into an Agreement for

1

Appointment of Policy Issuing Agent ("Agency Agreement") with Plaintiff. Pursuant to this Agency Agreement, Plaintiff appointed Defendant and Bay as its agents to issue certain title insurance forms underwritten by Plaintiff. The Agency Agreement entitled Plaintiff to twenty percent of the premiums paid to Defendant and Bay by title insurance policy purchasers, and required that Defendant and Bay keep such amounts due Plaintiff in a bank account separate from Defendant's or Bay's personal and operating accounts until remitting them to Plaintiff.[1] The Agency Agreement also required Defendant and Bay to submit to Plaintiff, on a monthly basis, reports of the title insurance policies issued during the previous month, with payment for the related amounts due Plaintiff attached thereto, alongside copies of the issued policies.

Defendant readily admits that he and Bay never segregated the premiums due to Plaintiff in a separate bank account. Rather, they used a single escrow account, labeled a "trust account," ("Escrow Account") which collected all the funds received in connection with title insurance policy transactions, including the premium payments. Upon receipt, Defendant and Bay transferred the entire premium payment, including the portion due Plaintiff, from this Escrow Account to Bay's general operating account. Their standard operating procedure was then to calculate the amount of the premiums received during the prior month that belonged to Plaintiff and send a monthly check to Plaintiff from Bay's general operating account in round amounts such as $2,500.00 or $5,000.00. They did not always make such a payment every month and, if business was slow during a prior month, he would not send a check at all.

---

[1] The relevant Agency Agreement provisions are as follows:
"Section III(E). Duties of Agent: Agent shall [k]eep safely in an account separate from Agent's operating accounts all funds received by Agent from any source in connection with transactions with which the Insurer's policy is involved, disburse said funds only for the purposes for which the same were entrusted, and reconcile such amounts not less frequently than monthly."
"Section VI. Agent's Commissions and Reporting Schedule: Agent shall remit to Insurer twenty percent (20%) of the title insurance rates specified in section V. . . . All amounts due Insurer pursuant to this agreement shall, upon receipt by Agent, be considered property of Insurer and shall be held in trust by Agent for the benefit of Insurer in a bank account separate and apart from Agent's personal and operating accounts until such time said amounts are paid over to Insurer."

Pursuant to the Agency Agreement, Plaintiff had the right to conduct audits of all financial and business records relating to any escrow closing or settlement functions conducted by Defendant and Bay ("Escrow Audit"). Plaintiff also had the right to conduct those audits of the policy inventory, title insurance files, and any material, files records or accounts, including financial and business records, relating to the issuance of title insurance forms ("Policy Audit"). During an Escrow Audit, Plaintiff would review bank account statements, reconciliations and trial balances relating to the Escrow Account in order to ensure Defendant and Bay were properly disbursing payments due third parties in connection with their closing responsibilities. Plaintiff would also conduct an interview with an employee or employees of Bay as part of this audit in order to verify that the company's title issuance procedures were in compliance with Plaintiff's requirements. A Policy Audit encompassed two different types of audits which could be performed separately. In the first, Plaintiff would review the inventory of individual insurance policies (referred to as "policy jackets") that Plaintiff had issued Defendant and Bay to sell in order to ascertain whether they had remitted to Plaintiff copies of those policies (and their respective premiums) that had been sold and issued to customers in connection with real estate transactions that had since closed. In the second, Plaintiff would review the physical files containing the insurance policy jackets to ascertain whether there were policy jackets relating to closing transactions for which insurance policies had been sold but not issued to customers. All the audits required employees of Plaintiff to visit Bay's offices and rely on Defendant and Bay's employees to provide accurate information and access to files as needed.

In November of 2003, Plaintiff conducted its first audit of Bay. Lisa Cicinelli, then an auditor for Plaintiff, visited Bay's offices and conducted an Escrow Audit. The audit revealed some reconciliation problems with the Escrow Account which Ms. Cicinelli detailed in a follow up letter. A checklist which would normally detail the interview Ms. Cicinelli conducted with an

employee of Bay was not offered into evidence. Ms. Cicinelli conducted a second Escrow Audit of Bay in November 2004. Again, in a follow up letter, Ms. Cicinelli indicated some reconciliation discrepancies relating to the Escrow Account. In addition, the letter warned that Defendant's practice of allowing employees not licensed as insurance agents to sign Defendant's name on insurance contracts was a violation of company policy and state law. Neither Escrow Audit revealed that Defendant was not segregating Plaintiff's premiums from Defendant's general operating account. Indeed, the checklist memorializing the interview Ms. Cicinelli conducted as part of the 2004 Escrow Audit with Jenny Wilkinson, a Bay employee, indicates that Ms. Wilkinson represented that Bay was in fact segregating Plaintiff's premiums in a separate account.

In May 2006, suspecting that Defendant and Bay were failing to timely remit premiums, Plaintiff conducted a Policy Audit alongside the Escrow Audit. The auditor, Faith Schemmel, discovered as part of the Escrow Audit that Defendant and Bay were still permitting employees to sign Defendant's name on insurance policies. The Policy Audit revealed that they had failed to remit premiums to Plaintiff in the amount of $85,194.09 in connection with insurance policies that had been sold and issued to customers. Plaintiff and Defendant and Bay subsequently came to an agreement whereby Plaintiff paid $50,000.00 of this debt in July 2006, with the remaining $33,194.09 to be paid in monthly installments of $3,000.00 commencing in August 2006.

In December 2006, acting on a notification from their bank that numerous insurance policies had been sold to customers by Defendant and Bay but had not actually been issued, Plaintiff conducted the second type of Policy Audit. This audit revealed that Defendant and Bay had received premiums pertaining to title insurance policies that Defendant had sold but had failed to issue to customers and had neglected to remit the premiums to Plaintiff in connection with these policies in the amount of $145,801.03. In addition, at that time, they still owed

4
08-04065-wsd    Doc 53    Filed 02/08/11    Entered 02/09/11 13:58:13    Page 4 of 15

Plaintiff $21,194.09 of the $85,194.09 debt from 2006 above referred to. On December 18, 2006, Philip Savich, Vice President of Plaintiff, and Defendant and Bay initialed a payment plan of a total debt of $166,995.12. When Plaintiff presented an agreement formalizing their understanding to Defendant at the end of December 2006, Defendant and Bay refused to sign it and informed Plaintiff that he was closing his business. Plaintiff then terminated the Agency Agreement on December 29, 2006 and Defendant filed for bankruptcy on January 30, 2007.[2]

On February 3, 2009, Defendant was the subject of a hearing before the Michigan Commissioner of Financial and Insurance Regulation as part of a case brought against him by the Office of Financial and Insurance Regulation, charging him with a violation of the Michigan Insurance Code. On June 29, 2009, the Administrative Law Judge issued a proposal for decision which found that Defendant violated MCL § 500.1207(1)[3] of the Michigan Insurance Code by failing to act as a fiduciary of money he received in his capacity as an agent because he failed to remit such money to the appropriate underwriters, including Plaintiff. On September 3, 2009, the Commissioner issued a final decision revoking Defendant's Michigan insurer producer license.

Plaintiff filed the present action on April 30, 2007, seeking to except from discharge the $166,995.12 debt owed to Plaintiff by Defendant.

Law and Discussion

523(a)(4)

Plaintiff argues that Defendant's debt should not be dischargeable under § 523(a)(4) because Defendant committed defalcation when, while acting as a fiduciary to Plaintiff, he failed to properly account for premiums collected and failed to make proper payment to Plaintiff in

---

[2] The parties' stipulated facts incorrectly state the date of Defendant's bankruptcy filing to be January 3, 2007.
[3] The relevant statutory provision reads as follows: "An agent shall be a fiduciary for all money received or held by the agent in his or her capacity as an agent. Failure by an agent in a timely manner to turn over the money which he or she holds in a fiduciary capacity to the persons to whom they are owed is prima facie evidence of violation of the agent's fiduciary responsibility."

connection with those premiums. Defendant alleges that Plaintiff knew of Defendant's failure to segregate those premiums in an account separate from Defendant's general operating account and failed to require such segregation. As such, Defendant argues that Plaintiff waived any contractual breaches and the fiduciary relationship created by either contract or statute, and is therefore now estopped from claiming a violation of such relationship. In addition, Defendant argues that the commingling of trust funds with a general operating account dissolves any trust relationship, thereby destroying the fiduciary relationship founded on such trust.

Exceptions to discharge are to be strictly construed against the creditor, <u>In re Ward</u>, 857 F.2d 1082, 1083 (6th Cir. 1988), and the standard of proof in 523(a) dischargeability exceptions is preponderance of the evidence, <u>Grogan v. Garner</u>, 498 U.S. 279, 291 (1991). Section 523(a)(4) prevents the discharge of debts which arise from fraud or defalcation while the debtor is acting in a fiduciary capacity. A defalcation that warrants a finding of non-dischargeability requires: (1) a fiduciary relationship; (2) breach of that fiduciary relationship; and (3) a resulting loss. <u>In re Garver</u>, 116 F.3d 176, 179 (6th Cir. 1997).

### A.   *Did a fiduciary relationship exist between Defendant and Plaintiff?*

Federal law determines whether there was a fiduciary relationship. <u>In re Johnson</u>, 691 F.2d 249, 251 (6th Cir. 1982). As such, 523(a)(4) does not apply to constructive or implied trusts, only express or technical trusts, and only applies to those debts created by a party already a fiduciary when the debt was created. <u>R.E. Am., Inc. v. Garver (In re Garver)</u>, 116 F.3d 176, 179 (6th Cir. 1997); <u>Commonwealth Land Title Co. v. Blaszak (In re Blaszak)</u>, 397 F.3d 386, 391 (6th Cir. 2005); <u>Davis v. Aetna Acceptance Co.</u>, 293 U.S. 328, 333 (1934). State law is important in determining whether the requisite express trust exists. <u>In re Johnson</u>, 691 F.2d 249, 251 (6th Cir. 1982); <u>see</u> <u>also</u> <u>In re Interstate</u>, 760 F.2d 121, 124 (6th Cir. 1985). Under Michigan law, the creation of a trust depends on intent and existence of the required elements. <u>In re Eastern</u>

Concrete Paving Co, 293 B.R. 704 (E.D. Mich. 2003) (citing Pirowich v. Metropolitan Life Insurance Co., 282 Mich. 118, 275 (1937)). These required elements of an express trust are: (1) clearly defined res; (2) unambiguous trust relationship; (3) specific, affirmative duties undertaken by the trustee. In re Eastern Concrete Paving Co, 293 B.R. at 708 (quoting Kitchen v. Boyd (In re Newpower), 229 B.R. 691, 705 (W.D. Mich. 1999)); see also In re Johnson, 691 F.2d at 252-53. In addition, state statutes such as MCL 500.1207(1) that define a relationship as a trust relationship will satisfy express or technical trust requirements as contemplated by the bankruptcy code. In re Livingston, 40 B.R. 1018, 1019 (E.D. Mich. 1984); In re Interstate, 760 F.2d at 124; see also In re Johnson, 691 F.2d at 252-53. Indeed, "Michigan case law has uniformly held that premium payments received by an insurance agency have the status of trust funds for the benefit of the insurance principle." In re Interstate, 760 F.2d at 124.

Plaintiff asserts that both the Agency Agreement and the state statute, MCL 500.1207(1), satisfy the express trust required by the type of fiduciary relationship contemplated by the bankruptcy code. Defendant does not appear to contest this assertion. That statute provides:

> An agent shall be a fiduciary for all money received or held by the agent in his or her capacity as an agent. Failure by an agent in a timely manner to turn over the money which he or she holds in a fiduciary capacity to the persons to whom they are owed is prima facie evidence of violation of the agent's fiduciary responsibility. An agent shall not accept payment of a premium for a medicare supplemental policy or certificate in the form of a check or money order made payable to the agent instead of the insurer. Upon receiving payment of a premium for a medicare supplemental policy or certificate, an agent shall immediately provide a written receipt to the insured.

MCL 500.1207(1). The Court concurs with Plaintiff that both the terms of the Agency Agreement and that statute provide for the existence of an express trust relationship between the parties and, therefore, imposed precisely the type of fiduciary duties upon Defendant contemplated by U.S.C. 11 § 523(a)(4).

### B. *Did Plaintiff waive this fiduciary relationship?*

Defendant alleges that Plaintiff waived this fiduciary relationship and contractual breaches by knowingly acquiescing in the practice of commingling the premiums owed to Plaintiff in Defendant's general operating account. However, this Court finds Defendant's supporting case law largely inapposite and Defendant's applicable testimony unpersuasive. Two of the three cases that Defendant cites in support of the contention that knowledgeable acquiescence by a creditor can defeat an action under 523(a) of the code pertain specifically to 523(a)(6) actions, not to a 523(a)(4) action or 523(a) actions generally. See In re McGinnis, 586 F.2d 162 (10th Cir. 1978); Wolfson v Equine Capital Corp., 56 F.3d 52 (11th Cir. 1995). While Defendant's third case does suggest that knowledgeable acquiescence may defeat some 523(a) actions, including a 523(a)(4) action, this language is dicta in a procedural ruling disposing of a request for an extension to file a complaint in a Chapter 7 proceeding. American Family Insurance Grp v Gumieny, 8 B.R. 602 (Bankr. E.D. Wis. 1981).

There is, however, some support for the assertion that a "fiduciary relationship, whether imposed by contract or by statute, may be waived by the parties. The waiver may be expressed verbally, but more often it is evidenced by a course of conduct that is inconsistent with the fiduciary relationship." Norton Bankruptcy and Law Practice 2d §§ 47:26. Moreover, such waiver must be "supported by evidence showing that the beneficiary of the trust had actual knowledge of and, in effect, acquiesced to the trustee's conduct which was contrary to the terms of the contract and the statutory fiduciary obligations." Commissioner of Ins. v. Del Valle Otero (In re Del Valle Otero), 174 B.R. 873, 881 (Bankr. D.P.R. 1994) (citing Matter of Murphy, 9 Bankr. 167, 175 (Bankr. E.D. Va. 1981)). One case, noting the dearth of publications considering the issue of waiver in relation to the fiduciary obligations of insurance agents arising from their collection of insurance premiums, held that the execution of a new contract between the trustee and beneficiary to provide for payment of unremitted insurance premiums and to

8
08-04065-wsd    Doc 53    Filed 02/08/11    Entered 02/09/11 13:58:13    Page 8 of 15

prevent further late payments constituted an exercise of the beneficiary's fiduciary rights, rather than a waiver of the fiduciary relationship. Del Valle Otero, 174 B.R. at 883. However, such a waiver has been upheld where the insurer has neglected to enforce its fiduciary rights, and the course of conduct between the parties shows that the insurer knowingly "financed" the agent's business through the use of premiums rather than requiring segregation of funds. Twin City Fire Insurance Co. v. Green, 176 F.2d 532, 535-36 (8th Cir. 1949).

This Court finds that Plaintiff did not knowingly acquiesce in the commingling of the premium funds in the general operating account. Defendant's primary piece of evidence indicating Plaintiff's knowledgeable acquiescence is his own testimony that, in a telephone conversation between himself and Lisa Cicinelli early in the agency relationship, Ms. Cicinelli either explicitly waived the contractual requirement of premium segregation or did so implicitly by suggesting, rather than mandating, that Defendant maintain a separate account for the premiums owed to Plaintiff. This evidence is outweighed by the more credible testimony to the contrary by Ms. Cicinelli, as well as testimony by Faith Schemmel and Philip Savich that such a waiver would run directly counter to Plaintiff's policies and has never been issued by Plaintiff to any of their agents. Indeed, Defendant's trial testimony implied that Ms. Cicinelli merely suggested that Defendant keep the portion of the premiums owed to Plaintiff in an account separate from the portion of the premiums due to Defendant – a statement that would only evidence Ms. Cicinelli's knowledge that the premiums themselves were commingled, not that they were being commingled with Defendant's general operating account. Moreover, the Escrow Audit questionnaires from 2004 and 2006 indicate that Defendant, or Defendant's employees, represented to Plaintiff that the premiums were in fact being segregated – reason alone to undermine Defendant's waiver argument.

9

While arguably Plaintiff might have done more to investigate discrepancies relating to Defendant's account (for example, Defendant's monthly premium payments were in round amounts, suggesting that Defendant was remitting estimates of the premiums owed to Plaintiff rather than the actual amounts then due), the aforementioned testimony, the audits performed by Plaintiff to ensure compliance, and the 2006 agreement between the parties requiring payment of outstanding premiums requires a conclusion that Plaintiff neither knowingly acquiesced in Defendant's commingling of the premium payments nor neglected to exercise its fiduciary rights in a manner that would constitute a waiver of the fiduciary relationship. It may be the case that Plaintiff may have had knowledge of the fact that the premiums were not segregated, but that does not equate to acquiescence to the point of concluding that Plaintiff agreed to alter the specific contract terms to the contrary. This would be particularly true in this case, where, among the other recited facts, there were apparently false representations that there was required segregation and there was a history of Plaintiff timely pursuing its rights to the funds owed it.

Importantly, the waiver argument misses the point as it essentially relates to the contractual and/or other requirements regarding the segregation of funds. It does not go to the essence or existence of the fiduciary relationship. As noted later in this opinion, that the obligation to segregate funds might have been waived either explicitly or by conduct, does not destroy the existence of the fiduciary relationship established both by the contract and the applicable statutes. A required segregation of funds is but a means by which the fiduciary relationship, otherwise established and maintained, may be policed and the amounts due and accounted for thereunder may be ascertained from time to time. It is not necessary to, or for, the continued existence of that relationship. Defendant and Bay had a continuing and ongoing fiduciary relationship with Plaintiff irrespective of whether or not there was any required segregation of fund, or if there was, whether or not that requirement was breached or waived.

## C. *Did Defendant's commingling of the trust funds destroy the trust?*

Defendant also argues that the very practice of commingling these trust funds in the general operating account dissolved the trust, thereby destroying any fiduciary relationship founded upon it. The case of In re Livingston, 40 B.R. 1018 (E.D. Mich. 1984) is relevant here. There, an insurance agent (the Debtor), made a fiduciary by virtue of contract and applicable statute, maintained a "Premium Account" into which were deposited all of the premiums received by him and destined for various insurance companies. One of those insurance companies sought nondischargeability of the premiums owed it under § 523(a)(4). The bankruptcy court found nondischargeability and the District Court affirmed on appeal. The appellant debtor argued that the fiduciary or trust relationship was destroyed by the failure to have segregated the Plaintiff's premiums. While the court noted that the premiums were not commingled with the debtor's general business funds (i.e., they were commingled with other company's premiums in a separate "Premium Account," and thereby did not lose their identity), the court went on to state variously that "[a]ppellant's view of the segregation requirement, however, is much to narrow" and "[m]oreover, the cases suggest that an insurance agent is a fiduciary of an insurance company." Id. at 1019. The court then went on to emphasize the statutory basis for the fiduciary relationship. In this Court's view, (a) if commingling makes a difference in, or is relevant to, the existence or non-existence of a fiduciary relationship, there is no legal difference in that regard between commingling of only insurance premiums on the one hand and commingling of insurance premiums with general operating funds on the other; neither form of commingling can or should negate the existence of a fiduciary relationship; and (b) Livingston fairly construed stands for the proposition that the overriding concern is whether or not a fiduciary relationship exists, irrespective of the nature of any commingling. Several Michigan courts have held that "the mixing of trust funds with private funds in a general deposit

11

does not obliterate the trust." See e.g., In re Zwagerman, 115 B.R. 540, 557 (Bankr. W.D. Mich. 1990). Michigan courts are in agreement that M.C.L. § 500.1207(1) imposes the status of trust funds on premiums received by insurance agents on behalf of insurance companies. Interstate, 760 F.2d at 124. Interstate went on to note that courts have interpreted the "similar" Michigan Builder's Trust Fund Act to impose the status of "trust" property on funds held by general contractors on behalf of their subcontractors. Id. As a result of the protection this statute affords subcontractors, funds held in trust by a general contractor retain their trust property status regardless of whether they are held in a separate trust account. See Blair v. Trafco Products, Inc., 142 Mich. App. 349, 369 (1985). To conclude otherwise would be to inappropriately allow an intentional breach of a contractual and statutorily created duty to become a defense to the existence of the fiduciary relationship created thereby. See, Northern Ins. Co. of New York v. Insuramericorp, Inc., 195 F. Supp. 2d 965 (W.D. Mich. 2002).

Alternately, Defendant argues that the funds received by the insurance agent are not to be considered held in trust until they are segregated. Even if this were true, in this case the evidence is that premiums were initially collected by Defendant and placed in a trust account separate from Defendant's general operating account before Defendant thereafter transferred them to the general operating account, thus approximating the situation, at least initially, in the Livingston case. Therefore, the transfer to the general operating account did not cause the trust relationship to dissolve and therefore the fiduciary relationship remained intact.

### D. *Does collateral estoppel establish defalcation?*

Plaintiff argues against Defendant that the 2009 ruling of the Michigan Commissioner of Financial and Insurance Regulation established that Defendant committed defalcation by failing to act as a fiduciary of money he received in his capacity as agent and consequently collateral estoppel therefore precludes the relitigation of this issue.

A federal court is to give a state administrative agency's fact finding the same preclusive effect that it would be entitled to in the applicable state court to which it would be entitled in the State's courts. In re Foster, 280 B.R. 193, 201 (Bankr. S.D. Ohio 2002); see also United States v. Utah Construction & Mining Co., 384 U.S. 394, 422 (1966). In Michigan, the doctrine of collateral estoppel applies to administrative determinations which are adjudicatory in nature, where a method of appeal is provided, and where it is clear that it was the legislative intention to make the determination final in the absence of an appeal." Senior Accountants, Analysts & Appraisers Ass'n v. City of Detroit, 399 Mich. 449, 457-458 (1976). Under Michigan law, collateral estoppel applies when the parties are the same or substantially identical across proceedings, the first proceeding resulted in a valid, final judgment, and during the prior proceeding the issue in question was actually litigated and necessarily determined." People v Gates, 434 Mich. 146, 452 (1990); see Dearborn Heights School Dist. No. 7 v. Wayne County MEA/NEA, 233 Mich. App. 120, 124 (1999). Where a plaintiff seeks to invoke collateral estoppel offensively however, Michigan courts have tended to apply a stricter mutuality requirement. See Howell v. Vito's Trucking and Excavating Co., 386 Mich. 37, 42-43 (1971) (court required mutuality of estoppel when collateral estoppel applied offensively).

Assuming the determination of the Michigan Commissioner of Financial and Insurance Regulation is entitled to the application of the collateral estoppel doctrine, this Court must determine whether the state agency's ruling meets the Gates requirements. In addition, as the Plaintiff is seeking to apply collateral estoppel offensively, the stricter mutuality rule required by Howell must be satisfied. As Plaintiff was not a party to the administrative proceeding in question and was not bound by such ruling, the mutuality of estoppel requirement is not satisfied and collateral estoppel does not apply.

> E. *Did defalcation occur, thus breaching the fiduciary relationship?*

Defalcation encompasses embezzlement, the misappropriation of trust funds held in any fiduciary capacity and the failure to properly account for such funds." Interstate, 760 F.2d at 126; see Citizens Mut. Auto. Ins. Co. v. Gardner, 315 Mich. 689, 699 (1946). There is no requirement that the complained of wrongdoing be intentional for a defalcation to occur as contemplated by § 523(a)(4). Interstate, 760 F.2d at 125. As explained by the Sixth Circuit:

> Michigan is among the states that have determined that defalcation, as the word is used in the federal bankruptcy laws, was intended to cover defaults other than deliberate malversions and includes a mere deficit resulting from a fiduciary's duty to make the proper payment of money coming into his possession.

In re Johnson, 691 F.2d 249, 255 (6th Cir. 1982).

The facts of this case make clear that Defendant committed defalcation while acting in a fiduciary capacity. Defendant readily admits that he failed to pay $166,995.12 owed to Plaintiff that he received in his capacity as an agent acting on Plaintiff's behalf. As this Court rejects Defendant's claims that the trust relationship had been waived at the time the defalcation occurred, this Court finds that Defendant misappropriated trust funds held in a fiduciary capacity on behalf of Plaintiff and therefore finds the amount of $166,995.12 nondischargeable pursuant to section 523(a)(4) of the Bankruptcy Code.

### Plaintiff's 523(a)(2) and 523(a)(6) Claims

As this Court has decided that the debt is non-dischargeable under 523(a)(4) the Court does not reach Plaintiff's remaining two claims premised on §§ 523(a)(2) and 523(a)(6).

Plaintiff shall prepare and present an appropriate order.

.

**Signed on February 08, 2011**

                              **/s/ Walter Shapero**
                              **Walter Shapero**
                              **United States Bankruptcy Judge**